IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 1:21-cr-00015-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. **JOSEPH GAYE**

    Defendant.

---

**THE GOVERNMENT'S SUR-REPLY TO THE DEFENDANT'S MOTION TO SUPPRESS REPLY [ECF 35]**

---

The United States of America, by and through its undersigned Assistant United States Attorney, hereby files its sur-reply pursuant to the Court's October 1, 2021 Order [ECF 36].

**A. <u>Gaye's consent was knowing and voluntary</u>**

Gaye disputes that he gave law enforcement consent to search unit 204 at 199 North Cook Street. The crux of his argument is that any consent was not voluntary, and even if it was, police exceeded the scope of it. His argument is without merit. ECF 35 at 2.

A person's voluntary consent to search must be the "product of a rational intellect and a free will," because "[i]t is elementary that one must know he is giving consent for the consent to be efficacious." *United States v. Gay*, 774 F.2d 368, 377 (10th Cir. 1985). But courts have consistently determined that "cases have never required perfect mental ability to find a consent to search was voluntary." *United States v. Sims*, 428 F.3d 945, 953 (10th Cir. 2005).

1

Despite having shot himself, Gaye was able to call 911, describe his emergency, give directions to his location, and recognize emergency personnel needed a code to get into the building. But most telling is that Gaye realized if he admitted to shooting himself he would be discovered unlawfully possessing a firearm, and he needed to report another person shot him to avoid being caught. In fact, Gaye's medical issues appear relatively mild in comparison to other more extreme cases where consent to search was deemed acceptable despite the defendant being significantly impaired. *See United States v. George*, 987 F.2d 1428 (9th Cir. 1993) (finding that a defendant hospitalized for a drug overdose after carrying heroin balloons in his digestive tract provided valid consent to search his motel room even though he did not stabilize until approximately four hours later); *see also United States v. Gay*, 774 F.2d 368 (10th Cir. 1985) (refusing to invalidate consent where defendant staggered and swayed while walking, slurred his speech, and had bloodshot eyes, wrinkled clothes, and unkempt hair).

Moreover, Gaye's suggestion that his consent must have been limited to "paramedics respond[ing] to his residence" or else "anyone who calls for emergency aid [is] consenting to a search by law enforcement" is nonsense. ECF 35 at 2. Courts have found that when a crime is reported by an individual who owns or controls the premises to which the police are summoned, and that individual either states or suggests that it was committed by a third person, he or she implicitly consents to a search of the premises. *See, e.g., United States v. Wesela*, 223 F.3d 656, 661 (7th Cir.2000) (finding implied consent where defendant's wife called 911 and summoned law enforcement to the residence alleging a crime was committed by the defendant, consented to their entry and search of the premises for evidence of the crime); *see also United States v. Hylton*, 349 F.3d 781 (4th Cir. 2003) (holding the tenant gave implied consent for police to enter the

residence and recover a firearm because she summoned police to her apartment based upon the allegation of unlawful conduct concerning the firearm). Gaye summoned emergency personnel to his residence on the premise he was the victim of an assault by an armed, masked assailant, who was still at large. No reasonable person would interpret his actions and statements other than a request that police deal with the situation by finding his shooter.

### B. Corporal Clayborn's actions were within the emergency exception to the warrant requirement

In his initial filing, Gaye claimed that Corporal Clayborn's observations of the shell casing, bloody chair, and other evidence exceeded the scope of the emergency exception because they were made after Gaye had been taken out of the unit. ECF 29 ¶ 3. The government responded by citing Corporal Clayborn's body-worn camera recording, which indisputably refuted that assertion. Gaye now claims that Corporal Clayborn exceeded the scope of the emergency exception because he was required to leave the unit once emergency personnel took over. ECF 35 at 2-3.  But like before, this argument is meritless.

As noted in the government's original response, the emergency aid exception requires that "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006). Gaye still concedes the initial entry to unit 204 was proper under the circumstances. Thus, the only issue is whether Corporal Clayborn's actions were reasonable, and it is clear they were.

Clayborn's observations of the unit were brief. They were also limited to items within a few feet of where Gaye was being treated, which were in plain view, and related

to the alleged assault. *See Najar*, 451 F.3d at 720 (10th Cir. 2006) (holding an officer's search under the emergency exception was reasonable in manner and scope where it was "confined… to only those places inside the home where an emergency would reasonably be associated"); *see also Illinois v. Andreas*, 463 U.S. 765, 771 (1983) (holding "[t]he plain-view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity"). Furthermore, law enforcement believed Gaye's armed assailant could still be in the area at the time.

### C. The search warrant was not unconstitutionally overbroad

Gaye maintains the search warrant obtained in this case lacked sufficient particularity. ECF 35 at 3-4. But in doing so, he makes several dubious assertions. For instance, he claims the search warrant and affidavit do not identify a specific crime, even though a common-sense reading of the materials indicates the offense is false reporting (C.R.S. § 18-8-111). or more plainly, that Gaye called 911 and falsely alleged a masked assailant shot him when he had shot himself, so police would not charge him with unlawfully possessing a firearm.[1]

He also takes portions of the search warrant materials significantly out of context. For example, he claims the search warrant explicitly authorized a search for any "item that may be present but not readily visible in order to further the investigation." ECF 35 at 5. But this is simply the concluding paragraph of the affidavit, which fully states "[y]our

---

[1] Gaye claims there is some significance to false reporting being a Class 2 misdemeanor. Even though such a distinction is not relevant to the analysis, it should be noted that the facts in the search warrant also establish probable cause for attempt to influence a public servant (C.R.S. § 18-8-306), which is a Class 4 felony.

4

affiant respectfully requests this search warrant in order to collect the above described evidence along with additional evidence that may be present but not readily visible in order to further this investigation." ECF 31-4. In this context, the excerpt adds nothing to the scope of the search warrant.

Similarly, he alleges the search warrant allows for the seizure of "[a]ny material evidence developed by a thorough crime scene investigation… tending to establish the motive or identity of any suspect or witness."  ECF 35 at 5. However, this part actually states "[a]ny material evidence developed by a thorough crime scene investigation *such as*… documentary evidence tending to establish the motive or identity of any suspect or witness." ECF 31-4 (emphasis added). Again, in this context, the language does not allow for the seizure of evidence of any crime, but only for the explicitly listed materials possibly "developed" during the "crime scene investigation" relating to the offense of false reporting.

*United States v. Suggs*, 998 F.3d 1125 (10th Cir. 2021) further illustrates the search warrant here did not lack particularity. In *Suggs*, a search warrant containing a provision that authorized law enforcement to search and seize "[a]ny item identified as being involved in crime" was found to violate the Fourth Amendment's particularity requirement. *Id*. at 1133. The ruling was based upon the Tenth Circuit's conclusion that the "catch-all" effectively allowed "officers to search for and seize evidence of any crime," and that the resulting lack of particularity could not be cured by the affidavit or severed from the parts of the warrant that were proper. *Id*. at 1133-40.

The issues plaguing the search warrant in *Suggs* are not present in the current case. As noted above, the plain language of the search warrant does not authorize the search and seizure of "evidence of any crime."  But even assuming there is a lack of

5

particularity with the warrant, this Court is able to consider the affidavit in its analysis, unlike the court in *Suggs*. *Id*. at 1135-6. This is incredibly significant because reading the warrant in conjunction with the affidavit, clearly indicates the search warrant is limited to evidence relating to false reporting (or attempt to influence a public servant).

The final distinguishing characteristic from *Suggs* is that the search warrant here is severable. A multistep analysis is conducted when making this determination. First, the court divides the warrant in a commonsense way. *Id*. at 1137-8. Then the court examines the validity of each section. *Id*. If at least one section passes constitutional muster—meaning it satisfies the probable cause and particularity requirements of the Fourth Amendment—the court determines whether the valid parts are distinguishable from the invalid ones. If the valid portions are distinguishable, the court may sever so long as they make up the greater part of the warrant. *Id*.

The court in *Suggs* determined the search warrant was not severable under this analysis because the valid portions did not make up the greater part of the warrant. *Id*. at 1139-40. The same cannot be said here, where the search warrant breaks down into three categories of items to be searched for and seized: (1) firearms and firearm accessories; (2) items tending to establish ownership or possession of any firearms and firearm accessories[2]; and (3) other material evidence relating to the offense of false reporting developed during the crime scene investigation. Even assuming the contested section pertaining to "material evidence" is invalid, the other sections are not linked to its language and describe distinct subject matter.

---

[2] The government believes the laptop computer, although separately listed, falls under this section.

D. **The good-faith doctrine applies**

Gaye's claim the good-faith doctrine should not be applied in this case also rests on questionable support. First, there is no evidence the judge "took less than a minute to review and sign the search warrant in this case." ECF 35 at 5. The time the affiant was sworn and the time the warrant was signed have no relation to when the judge reviewed the substance of the materials. And even if Gaye's allegation is true, he fails to cite to any authority indicating it is a relevant point in the analysis. Finally, a laptop computer meets the definition of "personal property tending to establish the identity of the person(s) in control or possession of the items seized" when it was located on the desk where the shell casing, firearm, and ammunition were discovered. Regardless of whether the laptop was explicitly mentioned in the search warrant, its relevance under this portion clearly subjects it to seizure.

E. **The recovery of the bullet did not violate the Fourth Amendment**

Gaye was almost immediately taken into surgery upon his arrival to Denver Health Medical Center. During the treatment, the bullet from his leg was removed and placed in a bag. It was then placed in a secured box near the hospital security desk and made available to law enforcement. *See* Ex. 1.

Although there is no Tenth Circuit case directly on point, the relevant and persuasive authorities support the conclusion Gaye's Fourth Amendment rights were not implicated in the recovery of the bullet. First, there is no evidence of any search or seizure occurring, because Denver Medical Center staff never acted at the direction of law enforcement. Staff removed the bullet from Gaye in the course of medical treatment, and voluntarily provided it to police. *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984) ("This Court has also consistently construed this protection as proscribing only

7

governmental action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.' "); *see also United States v. Chukwubike*, 956 F.2d 209 (9th Cir. 1992); *United States v. Attson*, 900 F.2d 1427, 1434 (9th Cir. 1990) (holding physicians that obtain evidence in the course of medical treatment do not possess the requisite intent to engage in a search or seizure under the Fourth Amendment.).

Even assuming for the sake of argument Denver Medical Center staff were governmental actors, Gaye's argument still fails because the Fourth Amendment "does not bar warrantless intrusions where government officials reasonably believe the intrusion is necessary to deal with a life-threatening emergency." *Mincey v. Arizona*, 437 U.S. 385, 393 (1978). There is no question medical staff made a reasonable and good faith intrusion to assist Gaye, who was in imminent danger of physical harm. As such, their actions did not run afoul of the Fourth Amendment. *See* 3 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 5.4(c), at 354 (2020); *see also United States v. Borchardt*, 809 F.2d 1115, 1118 (5th Cir. 1987) (holding a nurse's administration of an anti-narcotic drug to a defendant suffering from an overdose, which caused defendant to vomit and led to the discovery of heroin, was not an unreasonable search, because it was a reasonable and good faith intrusion to assist a person in imminent danger of physical harm).

Additionally, a number of state Supreme Courts have been presented with almost the exact same fact pattern presented in this case. In each case, the courts determined the Fourth Amendment is not implicated where a defendant voluntarily submits himself for treatment for a gunshot wound, and hospital staff later voluntarily gives the bullet to police*. See, e.g., Commonwealth v. Johnson,* 556 Pa. 216 (1999); *Houston v. State*, 299

8

Ark. 7 (1989); *Craft v. Commonwealth*, 221 Va. 258 (1980); *State v. Turner*, 101 Ariz. 85 (1966) (holding the surgical removal of bullets from the defendant was not an unreasonable search and seizure in violation of the Fourth Amendment, where surgery was not performed at the instigation of police, but at the request of the defendant and the doctor). Although most of these courts relied upon the lack of government action and implied consent to find the Fourth Amendment was not violated, a few courts went even further and determined the defendant also did not have standing to challenge the seizure of the removed bullet, because he did not retain either a property right or a privacy interest in it. *See Johnson*, 556 Pa. at 234; *see also Craft*, 221 Va. at 261-63.

Gaye avoids addressing any of the arguments from the government's response or in the above cases. Instead, he simply requests this Court adopt the reasoning from *United States v. Neely*, 345 F.3d 366 (5th Cir. 2003). But *Neely* is inapposite to the current case, as it concerned a situation where the police employed their official status to effectuate a seizure of the defendant's clothing, which was found to have invaded his possessory and privacy interest. Gaye, on the other hand, has not identified any evidence indicating "police employed their official status" to recover the bullet. Nor has he explained how he had a possessory or privacy interest in it.

Accordingly, *Neely* is inapplicable to the current case, and this Court should follow the relevant authority that overwhelming concludes no Fourth Amendment violation occurred.

### F. Conclusion

Therefore, based upon the above arguments, Gaye's Motion to Suppress Evidence [ECF 29] should be denied.

Dated: October 12, 2021

        Respectfully submitted,

        MATTHEW T. KIRSCH
        Acting United States Attorney

By:   s/ *Thomas Minser*
        THOMAS MINSER
        Assistant United States Attorney
        1801 California St., Suite 1600
        Denver, Colorado 80202
        Phone: (303) 454-0203
        Fax: (303) 454-0405
        E-mail: Thomas.Minser@usdoj.gov
        Attorney for the United States

## CERTIFICATE OF SERVICE

      I hereby certify that on October 12, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

      By:    s/ *Thomas Minser*
                THOMAS MINSER
                Assistant United States Attorney
                1801 California St., Suite 1600
                Denver, Colorado 80202
                Phone:  (303) 454-0203
                Fax:  (303) 454-0405
                E-mail: Thomas.Minser@usdoj.gov
                Attorney for the United States