**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 21-cr-15-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.    JOSEPH GAYE,

     Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

---

The Government charges Defendant Joseph Gaye with one count of unlawful possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.)

Before the Court is Gaye's Motion to Suppress Evidence ("Motion"), filed on August 30, 2021. (ECF No. 29.) On September 9, 2021, the Government filed its response (ECF No. 31). On September 24, 2021, Gaye filed his reply. (ECF No. 35.) On October 12, 2021, the Government filed its sur-reply. (ECF No. 37.)

After reviewing the parties' submissions and attached evidence, the Court concludes no hearing is necessary to resolve the Motion. For the reasons set forth herein, the Motion is denied.

## I. BACKGROUND[1]

On October 19, 2020, Gaye called 911 at approximately 5:30 p.m. to report that he had been shot by a masked assailant while in his office, located at 199 North Cook Street, Unit 204, Denver, Colorado, and that he required immediate medical attention. (ECF No. 29 at 1; ECF No. 31 at 1; ECF No. 32 at Ex. 1[2].)  Gaye provided the 911 dispatcher with the code to unlock the door to his building.  (ECF No. 32 at Ex. 1.) Denver Police Department Corporals Michael Clayborn and Michael Stoney arrived shortly after Gaye placed the 911 call.  (ECF No. 32 at Ex. 2[3].)  Because the code Gaye provided did not work to open the door to his building, Corporals Clayborn and Stoney broke into the building.  (ECF No. 32 at Ex. 2 and Ex. 3[4] at T23:40:21-T23:41:28.)  The corporals located Gaye's unit and announced their arrival before entering and clearing the room.  (*Id.* at T23:42:00-T23:42:20.)

When Corporals Clayborn and Stoney entered the unit, Gaye was lying on the floor beside a desk, suffering from an apparent gunshot wound to his testicles and upper thigh.  Corporals Clayborn and Stoney began rendering medical aid by applying a tourniquet to Gaye's upper left leg.  (*Id.* at T23:42:20-T23:44:39.)  Shortly thereafter,

---

[1] All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.  This factual summary is taken from the parties' briefs and supporting exhibits.

[2] Exhibit 1 is a recording of Gaye's October 19, 2020 911 call, which the Court has reviewed in its entirety.

[3] Exhibit 2 is Corporal Clayborn's body worn camera recording, which the Court has reviewed in its entirety.  Any times cited reflect the time in the upper right hand corner of the recording.

[4] Exhibit 3 is Corporal Stoney's body worn camera recording, which the Court has reviewed in its entirety.  Any times cited reflect the time in the upper right hand corner of the recording.

Emergency Medical Services ("EMS") paramedics arrived at the unit and began rendering medical assistance. (*Id.* at T23:42:20-T23:44:39.)

When the Court viewed the body worn camera recordings, it noted that there is a shell casing on top of a nearby desk, a bloody chair, and a laptop computer. (*Id.* at T23:47:12-T23:48:28.) Additionally, in Corporal Stoney's body worn camera footage, a paramedic can be clearly seen pointing to a gold shell casing on the desk near a laptop—apparently signaling this information to law enforcement—and someone in the room clearly said "shell casing." (*Id.* at T23:46:00-T23:47:00.) Police did not locate anyone else in the building, nor did they observe signs of forced entry.

Gaye was transported to Denver Medical Center,[5] where he underwent an operation to remove the bullet, which was given to Officer Kennedy.[6] (ECF No. 29 at 2; ECF No. 31 at 3.) Officer Kennedy did not have a warrant authorizing the seizure of the bullet. (ECF No. 29 at 2.)

Based on the corporals' observations, including a lack of evidence of a masked assailant, the location of the shell casing, the bloody chair, and the nature of Gaye's injury, the Government states that the police concluded it was likely Gaye shot himself and suspected him of making a false report. (ECF No. 31 at 2.) Subsequently, Detective Brian Lang, a Firearms Assault Shoot Team detective with the Denver Police Department, applied for a search warrant for unit 204 and submitted an affidavit in

---

[5] Gaye does not name the hospital where he was taken for surgery, and the Government refers to it as "Denver Medical Center." One of the Government's exhibits, the Report of Investigation, dated September 7, 2021, states that the bullet removed from Gaye was collected from "Denver Health Medical Center," located at 777 Bannock Street, Denver, Colorado, 80204. (ECF No. 37-1 at 1.)

[6] In his briefs, Gaye calls this individual "Officer Kennedy," without providing a first name or other title. It appears from the Report of Investigation that Officer Kennedy is Denver Police Department Crime Laboratory Technician Allison Kennedy. (ECF No. 37-1 at 1.)

support thereof.  (ECF No. 31-1.)

The warrant requested the following evidence:

- Any material evidence developed by a thorough crime scene investigation such as still and video photographing, measuring, other personal property of the victim, trace material of every kind such as clothing, fiber, hair, body fluids, and latent prints and objects on which they are found, documentary evidence tending to establish the motive or identity of any suspect or witness
- Articles of personal property tending to establish the identity of the person(s) in control or possession of the items seized, such as utility company receipts, rent receipts, canceled mail envelopes, vehicle registration, credit card receipts, repair bills, photographs, keys and articles of clothing.
- Any and All Firearms and Firearm components – including handguns, rifles, accessories, and/or simulated firearms
- Any and All Firearm Ammunition, – including live ammunition, expended projectiles, and/or expended shell-casings.
- Laptop computer

(ECF No. 31-1 at 1.)

The affidavit was reviewed by a deputy district attorney, and then was submitted with the search warrant, which incorporated the affidavit by reference.  (*Id.* at 1, 3–6.) The affidavit states that the corporals "conducted a search of the business and did not locate anyone else inside the building and did not observe any other signs of forced entry."  (*Id.* at 4.)  Additionally, the affidavit states that Corporal Clayborn informed Detective Lang that inside unit 204 "he observed blood on the office chair and a single spent cartridge casing lying on top of a desk on its side."  (*Id.*)  Detective Lang states in the affidavit that he was "notified that a laptop computer was located on the desk near the spent cartridge casing."  (*Id.*)  The affidavit includes Detective Lang's conclusion that based on his experience, "the injury GAYE suffered from may have been self-inflicted due to the trajectory of the wound," and requested authorization to search unit 204 for the above-described evidence, "along with additional evidence that may be present but not readily visible in order to further this investigation."  (*Id.* at 4.)

The Government states that the affidavit was sworn to by Detective Lang at 9:40

p.m. on October 19, 2020, and the warrant was signed by the Honorable Judge Isabel Pallares less than a minute later.  (*Id.* at 3.)  According to the Government, police subsequently searched unit 204 and seized bloody clothing and a Luger 9mm shell casing, previously observed by Corporals Stoney and Clayborn, which was still on top of the desk.  (ECF No. 31 at 2.)  The Government states that police also searched the drawers of Gaye's desk and discovered one was locked; after it was forced open, a 9mm Sig Sauer semi-automatic firearm with an obliterated serial number along with two boxes of Luger 9mm ammunition were found underneath a document addressed to Gaye.  (*Id.* at 3.)  The Sig Sauer was capable of holding twelve rounds in the magazine and one round in the chamber.  (*Id.*)  But at the time of its discovery, the gun held eleven rounds in the magazine and one in the chamber.  (*Id.*)  The Government states that the bullet recovered from Gaye's leg was submitted to the Denver Crime Laboratory for analysis, and subsequently was determined to have been fired from the Sig Sauer recovered from the desk in unit 204.  (*Id.*)

On February 2, 2021, Gaye was indicted on one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 1.)

## II. LEGAL STANDARD

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  However, "[t]he Amendment says nothing about suppressing evidence obtained in violation of this command.  That rule—the exclusionary rule—is a prudential doctrine created by th[e Supreme] Court to compel respect for the constitutional guaranty."  *Davis v. United States*, 564 U.S. 229, 236 (2011) (internal

citations and quotation marks omitted).  Under the exclusionary rule, a defendant may move for suppression of evidence obtained in violation of the Fourth Amendment.  *Id.*

"As a general matter, if the search or seizure was pursuant to a warrant, the defendant has the burden of proof" to demonstrate that it violated the Fourth Amendment.  *United States v. Maestas*, 2 F.3d 1485, 1491 (10th Cir. 1993) (internal quotation marks omitted).  However, on a motion to suppress evidence derived from a warrantless search and/or seizure, the defendant bears the burden of presenting a *prima facie* case that the Fourth Amendment has been "implicated," at which point the burden shifts to the Government to prove "that its warrantless actions were justified (*i.e.*, as a lawful investigatory stop, or under some other exception to the warrant requirement)."  *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *see also id*. at nn.1–2 (citing authorities).

### III. ANALYSIS

In the Motion, Gaye argues that the evidence recovered during the investigation violated his Fourth Amendment rights because: (1) the warrantless search by Corporal Clayborn exceeded the scope of the emergency exception to the warrant requirement; (2) the search warrant violated the particularity requirement; and (3) police needed (but did not obtain) a warrant to gain possession of the bullet after it was removed from his leg.  (ECF No. 29.)

### A.    Corporal Clayborn's Observations

In the Motion, Gaye argues that "[w]hile the initial entry into the residence at 199 North Cook Street was justified under the emergency exception to the warrant requirement, Corporal Clayborn's subsequent search exceed the scope of the exception.  Once Mr. Gaye was transported by the EMTs the emergency had ended,

6

and Corporal Clayborn had a duty to leave 199 North Cook Street."  (ECF No. 29 at 2.)

Gaye contends that he never consented to law enforcement conducting a search of unit

204, and that in his 911 call, he "is requesting paramedics respond to his residence, not

law enforcement."  (ECF No. 35 at 2.)  He argues that the emergency exception to the

warrant requirement does not apply here, a situation in which the "initial entry . . . was

authorized by the emergency exemption," but where the "shell casing, bloody chair, and

other observations were discovered after the circumstances permitting the exception

had expired."  (*Id.* at 3.)  Finally, he argues that because the shell casing and bloody

chair were not observed until after the emergency exception had expired, the plain view

doctrine does not apply.  (*Id.*)

For the following reasons, the Court finds that each of Gaye's arguments are

without merit.

1.    Implied Consent

A warrantless search can be valid "with the voluntary consent of an individual

possessing authority."  *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citations

omitted).  The standard for measuring the scope of an individual's consent is "objective

reasonableness," or more plainly, "what would the typical reasonable person have

understood by the exchange between the officer and the [person giving consent]?"

*Florida v. Jimeno*, 500 U.S. 248, 251 (1991).  "It is the government's burden of proving

that consent is given freely and voluntarily."  *United States v. Jones*, 701 F.3d 1300,

1318 (10th Cir. 2012) (internal quotations and citation omitted).

In this case, the Court has no trouble concluding that Gaye voluntarily gave his

implied consent for law enforcement to search unit 204.  Bleeding and in pain, Gaye

voluntarily called 911, told the dispatcher that a masked assailant had shot him, and

provided his address and an access code to the building.  (ECF No. 32 at Ex. 1.)  His contention that he only requested paramedics and not law enforcement in the 911 call, or else "anyone who calls for emergency aid in [sic] consenting to a search by law enforcement" is, as the Government argues, "nonsense."  (ECF No. 35 at 2; ECF No. 37 at 2.)

The Government cites ample authority demonstrating that when a crime is reported by an individual who owns or controls the premises to which the police are summoned, and that individual either states or suggests that it was committed by a third person, he or she implicitly consents to a search of the premises.  (ECF No. 37 at 2–3 (citing *United States v. Wesela*, 223 F.3d 656, 661 (7th Cir. 2000) (finding implied consent where defendant's wife called 911 and summoned law enforcement to the residence alleging a crime was committed by the defendant, consented to their entry and search of the premises for evidence of the crime); *see also United States v. Hylton*, 349 F.3d 781 (4th Cir. 2003) (holding the tenant gave implied consent for police to enter the residence and recover a firearm because she summoned police to her apartment based upon the allegation of unlawful conduct concerning the firearm)).)  It is well-recognized that the "touchstone of the Fourth Amendment is reasonableness."  *Jimeno*, 500 U.S. at 250.)  Because Gaye reported on the 911 call that he had been shot by a masked assailant, who was still at large, (ECF No. 32 at Ex. 1), it is eminently reasonable to conclude that by calling 911 and reporting that an intruder shot him, Gaye was at least giving implied consent that law enforcement enter unit 204, investigate the situation, and gather evidence in connection with the shooting.

 2. <u>Emergency Exception to the Warrant Requirement</u>

Even if Gaye had not provided his implied consent to law enforcement to enter

unit 204, the Court would nonetheless uphold their entry to the unit under the emergency aid exception to the warrant requirement.

"[W]arrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978) (internal quotations and citation omitted).  One type of exigent circumstance is the emergency aid exception, also referred to as an exception based on "the risk of personal injury," which requires that "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable."  *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006).

Gaye concedes in the Motion and his reply that the emergency exception authorized the officers' initial entry into unit 204.  (ECF No. 29 at 2; ECF No. 35 at 3.)  In his Motion, he first argues that Corporal Clayborn's observations of the shell casing, bloody chair, laptop, and "lack of evidence of an intruder or outside protectory[7]," were made *after* EMS transported Gaye to the hospital.  (ECF No. 29 at 1.)  In response, the Government cited Corporal Clayborn's body worn camera recording, which depicts Corporal Clayborn observing these items *while* Gaye and EMS were still in unit 204 and during a time in which law enforcement believed Gaye's alleged assailant was still at large.  (ECF No. 32 at Ex. 2.)  Thus, in his reply, Gaye changes course.  Now, he argues that Corporal Clayborn exceeded the scope of the emergency exception

---

[7] The Court cannot discern what Gaye's counsel means by "outside protectory."

because he was required to leave unit 204 once EMS took over the emergency situation, and as a result, the plain view doctrine does not apply.  (ECF No. 35 at 3.)

As noted above, Gaye has conceded that law enforcement's initial entry into unit 204 was reasonable, satisfying the first prong of the emergency aid exception.  Thus, under the second prong, the Court must determine whether "the manner and scope of the search is reasonable."  *Najar*, 451 F.3d at 718.  The Court has little difficulty concluding that they were.  The Court's review of Corporal Clayborn's body worn camera recording shows that he made his observations quickly, as EMS removed Gaye from unit 204.  The shell casing, bloody chair, and laptop are all within a few feet of where he and Corporal Stoney rendered initial medical aid to Gaye before EMS arrived. In other words, Corporal Clayborn did not go digging through far-reaching corners of the unit to unearth the evidence at issue.  Instead, this evidence was directly and openly in front of him in plain view, and clearly tied to the shooting Gaye reported on the 911 call. The body worn camera recordings both show the shell casing on the desk next to the laptop, and the bloody chair beside Gaye, who was on the floor when the officers arrived.  Based on this evidence, the Court finds that Corporal Clayborn's actions were reasonable and proper under the emergency exception to the warrant requirement.  *See Najar*, 451 F.3d at 720 (concluding the entry and search of defendant's home was lawful where officers confined their search to only those places inside the home where an emergency would reasonably be associated and where officers had reasonable grounds to believe there was an immediate need to investigate concerns for the life or safety of another).

3.     Plain View Doctrine

"The plain-view doctrine authorizes seizure of illegal or evidentiary items visible

to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983) (citation omitted).  The doctrine "is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy."  *Id.*

Here, the Court has already concluded that Corporal Clayborn's entry into the unit and observations he made therein were lawful, considering Gaye's implied consent and the fact that the corporals were acting pursuant to the emergency aid exception. Accordingly, his observations of the shell casing and the bloody chair are similarly lawful based on this "prior Fourth Amendment justification."  *Id.*  These items are in plain view on the officers' body worn camera recordings.  (ECF No. 32 at Exs. 2, 3.)  As the Government points out, "Corporal Clayborn could have done more than just observe the evidence at the time, he could have seized the items because they related to the shooting."  (ECF No. 31 at 6 (citing *Andreas*, 463 U.S. at 771).)  Thus, because Corporal Clayborn's observations were made while he was lawfully present in unit 204 pursuant to Gaye's consent and the emergency aid exception, the Court finds that his argument that his Fourth Amendment rights were violated fails.

**B.     Search Warrant**

     1.     Particularity Requirement

The Fourth Amendment provides that "no Warrants shall issue" without "particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  To this end, a search warrant must "describe the items to be seized with as much specificity as the government's knowledge and

circumstances allow." *United States v. Suggs*, 998 F.3d 1125, 1132 (10th Cir. 2021) (quoting *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988)).

"When interpreting warrants, [the Tenth Circuit] has adopted a standard of practical accuracy rather than technical precision." *United States v. Ortega-Jimenez*, 232 F.3d 1325, 1328 (10th Cir. 2000) (internal quotations omitted). "The particularity requirement is satisfied when the description of an item to be searched for and seized pursuant to a warrant enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Sells*, 463 F.3d 1148, 1154 (10th Cir. 2006) (quoting *Leary*, 846 F.2d at 600). "Even a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit." *Id.*

In the Motion, Gaye argues that the warrant authorized a "general search" in violation of the Fourth Amendment. (ECF No. 29 at 2–4.) Specifically, he asserts that the warrant is unconstitutionally broad because it does not identify the specific crime being investigated and authorizes the search and seizure for evidence of any crime. (*Id.*) For support, he identifies the first paragraph of the warrant, which allows the seizure of "any material evidence," but according to Gaye, "fails to identify what crime the evidence would relate to." (*Id.* at 3.) Additionally, he highlights the last paragraph of the affidavit, which he states allows law enforcement to "search for additional evidence that may be present but not readily visible to further investigation into this unknown crime." (*Id.*)

Despite Gaye's arguments, the Court finds that the warrant and affidavit, which is incorporated by reference to the warrant, are sufficiently particular such that no Fourth

Amendment violation has occurred.  First, the Court finds that the warrant and its accompanying affidavit adequately describe the criminal activity under investigation. The Tenth Circuit has sustained a warrant which did not limit the search to any alleged violation of a particular criminal law in a case where the warrant's affidavit contained information indicating that the suspect was engaged in a marijuana trafficking operation. *United States v. Le*, 173 F.3d 1258, 1274 (10th Cir. 1999) (citing *United States v. Harris*, 903 F.2d 770, 774–75 (10th Cir. 1990)).

This case is similar to *Le*.  While the affidavit does not mention a specific criminal statute that law enforcement suspected had been violated, it includes substantial language indicating that law enforcement found no evidence of forced entry or Gaye's purported masked assailant, but did see evidence signifying that Gaye might have shot himself.  For instance, Detective Lang states in the affidavit that "Corporal Clayborn . . . observed blood on the office chair and a single spent cartridge casing lying on top of a desk . . . ."  (ECF No. 31-1 at 4.)  And critically, Detective Lang states: "Based on your Affiant's experience the injury GAYE suffered from may have been self-inflicted due to the trajectory of the wound."  (ECF No. 31-1 at 4.)  When viewed in light of the additional descriptive language in the affidavit which explains that "[o]fficers conducted a search of the business and did not locate anyone else inside the building and did not observe any other signs of forced entry," the Court finds that the warrant is consistent with the "practical accuracy" standard of *Ortega-Jimenez*.  It is true that Detective Lang's language in the affidavit does not precisely accuse Gaye of falsely reporting an intrusion and shooting.  However, as in *Le*, the Court concludes that his language is "specific enough to give the executing officers adequate guidance, when searching the

business, to be able to 'distinguish between items that may and may not be seized.'"

*Le*, 173 F.3d at 1274 (quoting *Leary*, 846 F.2d at 602).

Next, the Court addresses Gaye's argument that the warrant is unconstitutionally overbroad.  Gaye argues that the following requests for evidence in the warrant demonstrate that it is overbroad and constitutes "the general rummaging the particularity requirement was designed to prevent":

- "additional evidence that may be present but not readily visible in order to further this investigation"; and

- "Any material evidence developed by a through [sic] crime scene investigation . . . tending to establish the motive or identify of any suspect or witness."

(ECF No. 35 at 4–5.)

The Court agrees with the Government's assessment that Gaye "takes portions of the search warrant materials significantly out of context" in arguing that the warrant authorizes a search for evidence of any crime.  (ECF No. 37 at 4.)  As to the first statement, it is merely an excerpt from the concluding paragraph of the affidavit, which fully states: "Your Affiant respectfully requests this search warrant in order to collect the above described evidence along with additional evidence that may be present but not readily visible in order to further this investigation."  (ECF No. 31-1 at 4.)  When put into context, this statement does not add any evidence to the scope of the warrant's requested evidence.

Regarding the second statement, Gaye omits key language.  The evidence requested in the warrant is:

> Any material evidence developed by a thorough crime scene
> investigation such as still and video photographing,
> measuring, other personal property of the victim, trace

> material of every kind such as clothing, fiber, hair, body
> fluids, and latent prints and objects on which they are found,
> documentary evidence tending to establish the motive or
> identity of any suspect or witness.

(*Id.* at 1.)  When read in context, the warrant does not impermissibly request or allow seizure of evidence of *any* crime; rather, the warrant allows law enforcement to search for and seize material evidence "developed" in connection with *this* crime scene investigation, which according to Detective Lang's language in the affidavit, relates to a possible crime of false reporting.

For support, Gaye relies on *Cassady v. Goering*, 567 F.3d 628 (10th Cir. 2009), a case in which the Tenth Circuit determined a search warrant was unconstitutionally overbroad because it contained a provision that effectively authorized police to search for all evidence of criminal activity, without limitation.  *Id.* at 635.  But as explained above, no general search authorization is present here.  Unlike *Cassady*, the search warrant materials case only authorized police to look for evidence in connection with their suspicion that Gaye falsely reported the intruder and shooting.  Although a statutory citation was not included in the warrant or affidavit, it was not necessary in light of the description of the offense in the search warrant affidavit.

The Court is mindful of the Tenth Circuit's recent decision in *Suggs*, which prohibits a search for "evidence of any crime," rather than only evidence related to the crime at issue in the case.  *Suggs*, 998 F.3d at 1135.  This case is distinguishable from *Suggs* because here, the Court can consider the affidavit, which was incorporated by reference.  (ECF No. 31-1 at 1.)

The Tenth Circuit stated in *Suggs* that "[a] supporting affidavit can sometimes cure a warrant's lack of particularity," if the warrant and the affidavit are attached and

the warrant expressly incorporates the affidavit.  *Id.*  Both requirements are met here, where the affidavit is attached to the warrant, and where the warrant includes the following language: "Based upon the affidavit of the above named affiant, which is incorporated by reference . . . ."  (ECF No. 31-1 at 1.)  Because the Court can consider the affidavit in this case, the Court can similarly consider all of the crucial details Detective Lang includes in the affidavit.  That language, described in detail above, supports the proposition that the warrant and affidavit before the judge were sufficiently particular under the relevant Fourth Amendment case law, including that law enforcement observed no evidence of a forced entry or a masked assailant at unit 204. Officers *did*, however, observe evidence, such as the shell casing on the desk and the trajectory of Gaye's wound, bolstering their suspicion that Gaye shot himself and then falsely reported a crime to conceal his self-inflicted injury.  Under these circumstances, the Court finds that the warrant is sufficiently particular to pass constitutional muster.

        2.    <u>Good Faith Doctrine</u>

Even if the warrant lacked sufficient particularity, the Court would nonetheless find that the good faith doctrine applies.

"Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'"  *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 922–923 (1984)).  Thus, a defendant can only challenge the warrant when it is "obvious that no reasonably competent officer would have concluded that a warrant should issue."  *Id.* (citation omitted).  The Supreme Court has found that the "shield of immunity" otherwise

conferred by a warrant will be lost "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (internal quotations and citation omitted).

As a general matter, the Court concludes that law enforcement acted in good faith reliance on a search warrant which was reviewed by a deputy district attorney and signed by a judge.  As the Government points out, the affiant of the search warrant, Detective Lang, was present for the search warrant's execution, and the resulting seizures were limited to items related to the subject offense.  (ECF No. 31 at 8 (citing *United States v. Guidry*, 199 F.3d 1150, 1155 (10th Cir. 1999) (applying good faith exception where the agent executing the warrant and was involved in the investigation although he was not the affiant on the warrant)).)  Nonetheless, the Court addresses Gaye's arguments as to why the good faith doctrine should not apply.

Here, Gaye argues that the good faith doctrine should not apply for two reasons. First, he argues that the good faith doctrine does not apply because the judge "took less than a minute to review and sign the warrant," so Detective Lang "was on notice that he could not rely on a neutral and detached magistrate preforming [sic] their duty."  (ECF No. 35 at 5.)  Gaye cites no case law supporting this assertion, and in the absence of any explanation or evidence linking the amount of time the judge took to review and sign the warrant to its constitutional validity, the Court finds this argument to be without merit.  *See Phillips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir.1992) (quoting *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir.1990)) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits

the point.'").

Gaye's second argument is equally baseless.  He contends that the seizure of Gaye's laptop "argues against the good faith exception" because there "is nothing in the Affidavit which could possibly be argued as supporting probable cause for the laptop computer." (*Id.*)  According to Gaye, the laptop's inclusion in the warrant and its subsequent seizure are "evidence Detective Lang was on and aware [sic] the search a [sic] general fishing expedition in violation of the Fourth Amendment." (*Id.*)  Gaye does not provide any further explanation or clarification of this argument, nor does he cite any authority in support of this specific assertion.  As such, he has forfeited this argument by failing to appropriately develop it.  *See Phillips*, 956 F.2d at 953–54.

Regardless of these deficiencies in Gaye's briefing, the Court agrees with the Government's assertion that "a laptop computer meets the definition of 'personal property tending to establish the identity of the person(s) in control or possession of the items seized' when it was located on the desk where the shell casing, firearm, and ammunition were discovered." (ECF No. 37 at 7.)  The laptop is listed in the bulleted list of property to be seized in the warrant.  (ECF No. 31-1 at 1.)  It is also listed in Detective Lang's affidavit.  (*Id.* at 3.)  Finally, Detective Lang states that he was notified that a laptop computer was located on the desk near the spent cartridge casing.  (*Id.* at 4.)  The relevance of the laptop to law enforcement's request to search for property tending to establish the identity of the person in control of the items seized establishes its relevance and subjects it to seizure.

Therefore, both of Gaye's arguments against application of the good faith doctrine are without merit.

**C.    Recovery of the Bullet**

In the Motion, Gaye argues that the Court should suppress the recovery of the bullet.  (ECF No. 29 at 4.)  He points out that according to the property invoice, Officer Kennedy recovered a metal object from Gaye's left thigh, though Officer Kennedy did not have a seizure warrant for the bullet at the time.  (ECF No. 29 at 4.)  Gaye generally notes that the underlying premise of the Fourth Amendment is that warrantless searches and seizures are *per se* unreasonable except for a few narrowly defined exceptions.  (*Id.* (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971)).)  In his reply (ECF No. 35 at 6), Gaye concedes that there is no Tenth Circuit case law on point but encourages the Court to adopt the reasoning of *United States v. Neely*, in which the Fifth Circuit held that the defendant had not forfeited his possessory interest in his clothing by entering the hospital for treatment, and that police presumptively violated his Fourth Amendment rights by retrieving his clothes from the hospital.  345 F.3d 370 (5th Cir. 2003).

In response, the Government argues that the recovery of the bullet did not violate the Fourth Amendment because: the recovery of the bullet was not the result of a government action (ECF No. 31 at 9), and Gaye has no standing to challenge the seizure (*id.* at 9–10).

Although both parties concede there is no Tenth Circuit authority governing this particular situation (ECF No. 35 at 6; ECF No. 37 at 7), the Court finds that no Fourth Amendment violation occurred.  The Supreme Court teaches that the Fourth Amendment's protection only applies when the search or seizure involves government action.  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  The Fourth Amendment is not applicable "'to a search or seizure, even an unreasonable one, effected by a

private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *Id.* at 113–14 (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980)).

In this case, it is undisputed that Gaye called 911 and requested emergency assistance after being shot, and that EMS took Gaye to the hospital for surgery.  (ECF No. 32 at Ex. 1.)  As an initial matter, Gaye does not argue that Denver Medical Center or the hospital staff are government actors.[8]  (*See* ECF Nos. 29, 35.)  In his reply, Gaye does not dispute the Government's statements that during the operation, hospital staff removed a bullet from Gaye's body, placed it in a bag and then in a secure box near the hospital security desk, where staff voluntarily provided it to law enforcement.  (ECF No. 31 at 9; ECF No. 35; ECF No. 37 at 7; ECF No. 37-1.)  There is no evidence that hospital staff acted at the direction of law enforcement at the time the bullet was removed.  *See Jacobsen*, 466 U.S. at 113 ("This Court has also consistently construed this protection as proscribing only governmental action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'"); *see also United States v. Chukwubike*, 956 F.2d 209, 212–13 (9th Cir. 1992) (finding that doctors had no right to keep balloons of heroin removed from defendant's body from federal agents and that because the government was not

---

[8] Even if the Court were to find that the hospital staff were government actors—which it does not—the Court nonetheless concludes no Fourth Amendment violation occurred.  The Supreme Court has found that "[t]he need to protect or preserve life or avoid serious injury is justification for what would otherwise [be] illegal absent an exigency or emergency."  *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (also noting that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid").  Here, given the nature of Gaye's injury, the hospital staff reasonably intruded to render medical aid to Gaye, who was certainly in need of immediate aid, as he was "in extreme pain and in danger of bleeding to death."  (ECF No. 35 at 2.)

conducting a search, there was no requirement for the government to obtain a warrant); *United States v. Attson*, 900 F.2d 1427, 1434 (9th Cir. 1990) (holding physicians that obtain evidence in the course of medical treatment do not possess the requisite intent to engage in a search or seizure under the Fourth Amendment).  Rather, under these circumstances, it is clear that hospital staff acted not at the behest of law enforcement but in the interests of Gaye's physical well-being.  Here, the hospital and medical professionals made a separate and independent decision that removal of the bullet was in Gaye's best interest, and there is no evidence that law enforcement directed them to do so.  As such, the Court cannot find the required government action to support Gaye's claim that his Fourth Amendment rights were violated by the seizure of the bullet.

Having concluded that the removal of the bullet by the hospital staff implicates no Fourth Amendment concerns, the Court proceeds to examine whether law enforcement's warrantless seizure of the bullet, after its removal from Gaye, violated his Fourth Amendment rights.  In other words, does Gaye have standing to challenge the seizure of the bullet?

"A defendant may not challenge an allegedly unlawful search or seizure unless he demonstrates that his own constitutional rights have been violated."  *United States v. Conway*, 73 F.3d 975, 979 (10th Cir. 1995) (quoting *United States v. Rubio–Rivera*, 917 F.2d 1271, 1274–75 (10th Cir. 1990)).  Standing to lodge such a challenge depends upon two factors: (1) whether the defendant demonstrated by his conduct a subjective expectation of privacy, and (2) whether society is prepared to recognize that expectation as reasonable.  *Smith v. Maryland*, 442 U.S. 735, 740 (1979).  The party moving to suppress evidence obtained as a result of an allegedly unconstitutional search has the

duty to demonstrate a subjective expectation of privacy that society is prepared to recognize as reasonable.  *United States v. Carr*, 939 F.2d 1442, 1444 (10th Cir. 1991); *see also Rakas v. Illinois*, 439 U.S. 128, 131 n.1 (1978) ("[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure").

The Court concludes Gaye has failed to demonstrate he has standing to challenge seizure of the bullet.[9]  When Gaye called 911 for emergency assistance, claiming he was a victim of a shooting by a masked assailant, he consented to the removal of the bullet from his body.  Although he may not have intended for hospital staff to give the bullet to law enforcement, he voluntarily gave the hospital staff the ability to do so by calling 911 and requesting emergency medical aid.  Further, the Court agrees with the Government's contention that, "given his allegation that a masked assailant was responsible for his injuries, the nature of his interaction with staff hardly supports any 'reasonable inference' that Gaye 'took normal precautions to maintain his privacy.'"  (ECF No. 37 at 9 (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980)). There is no evidence, for example, that Gaye asked hospital staff to keep the bullet, or to refrain from turning it over to law enforcement, or return it to him.  Nor has Gaye submitted an affidavit in which he claims that he had a subjective privacy interest in the bullet after it was removed from his leg.

The Court also concludes that society is not prepared to accept Gaye's expectation of privacy in the bullet after it was removed from his leg as reasonable.  He voluntarily called 911 and requested medical assistance as a result of a purported

---

[9] Gaye makes no argument whatsoever to meet his burden under *Smith*.  (ECF No. 29 at 4; ECF No. 35 at 6.)

intrusion into his office by a masked assailant who shot him.  As such, it is a logical next step that hospital staff would provide that bullet to law enforcement, which would be critical evidence in building a future case against Gaye's alleged assailant.

Moreover, Gaye's purported privacy interest is not reasonable because it is inconsistent with law enforcement's standard practices in similar situations.  In the Report of Investigation, Special Agent Lynn Thrapp spoke with investigators from the Denver Police Department who informed her that

> removing "projectiles" such as bullet fragments from patients is a common practice in the hospital and the removal of the bullet fragments is due to medical reasons and is not at the request of law enforcement.  SA Thrapp was told it is standard procedure for the bullet fragments that are removed from patients to be given to law enforcement during the course of the investigation.

(ECF No. 37-1 at 1–2.)   Therefore, Gaye has no standing to challenge law enforcement's recovery of the bullet.[10]

### IV. CONCLUSION

For the reasons stated above, the Court ORDERS:

1.      Defendant's Motion to Suppress Evidence (ECF No. 29) is DENIED; and

2.      The Court will enter a separate order resetting the Final Trial Preparation

Conference and the trial date.

---

[10] It is notable that in his reply brief, Gaye makes no substantive argument addressing any of these arguments by the Government.  (*See* ECF No. 35 at 6.)  Instead, he merely recites the facts and legal conclusions of *Neely*, without applying those legal conclusions to the facts of his case—apparently, he relies on the Court to make these arguments and inferences for him. Nonetheless, Gaye's reliance on *Neely* does not change the Court's conclusion.  *Neely* is a Fifth Circuit opinion and is thus not binding on this Court.  Given the facts of this case, which are distinguishable from *Neely*, the Court declines to adopt the reasoning set forth in *Neely*.

Dated this 12th day of November, 2021.

BY THE COURT:

_____
William J. Martinez
United States District Judge